OPINION

This case concerns whether the Navajo Nation Labor Commission (Commission) has jurisdiction to hear complaints by employees at the Navajo Generating Station (Station), which operates on the Navajo Nation (Nation) pursuant to a lease. The Court holds that there is jurisdiction, vacates the decisions of the Commission, and remands for further proceedings.
I
The relevant facts are as follows. Appellant Leonard Thinn (Thinn) was an employee of Appellee Station. Appellant Sarah Gonnie (Gonnie) was an employee of Appellee Headwaters Resources, a company doing contract work at the Station. Both were terminated by their respective employers. The Station is located on trust land within the Navajo Reservation. It operates under a lease between the Navajo Nation and Arizona Public Service Company and several other outside utilities signed in 1969. The Navajo Nation Council (Council) delegated its authority to approve the lease to the Advisory Committee of the Council. In its delegation resolution, the Council authorized the Advisory Committee to approve a lease with terms “the Advisory Committee deems to be in the best interest of the Navajo Tribe.” Resolution No. CMY-45-69, Resolved Clause 1(f) (May 27, 1969). The Advisory Committee then approved the lease and authorized Chairman Raymond Nakai to sign it. Chairman Nakai signed it on behalf of the Nation on September 29, 1969. One section of the lease purports to waive the Nation’s authority to regulate certain activities at the Station:
[The Nation] will not directly or indirectly regulate or attempt to regulate the Lessees in the construction, maintenance or operation of the Navajo Generating Station and the transmission systems of the Lessees, or the construction, maintenance or operation of the Fuel Transporter. This covenant shall not be deemed a waiver of whatever rights the Tribe may have to regulate retail distri- *561 button of electricity on Reservation lands.
Lease, ¶ 16. A separate section of the lease covers employment preference, mandating that the Station give “preference in employment to qualified local Navajos.” Lease, f 18. That provision further defines “local Navajos” and sets out under what circumstances such Navajos are to be given preference. The parties have not amended the lease since its execution.
Thinn and Gonnie filed separate complaints before the Navajo Nation Labor Commission, arguing that their terminations violated the Navajo Preference in Employment Act (NPEA). The Council passed the NPEA in 1985 to regulate employment relationships within the Nation. The act requires, among other things, that employers provide “just cause” when terminating employees. See 15 N.N.C. § 604(B)(8) (2005). Both Ap-pellees moved to dismiss the complaints for lack of subject matter jurisdiction, arguing that the Nation had waived the authority to regulate employment in Paragraph 16 of the lease. Appellees also argued that the Ninth Circuit Court of Appeals had already concluded that the Nation lacked authority to apply the NPEA under a virtually identical lease provision in its opinion in Arizona Public Service, Co. v. Aspaas, 77 F.3d 1128 (1996). Aspaas concerned whether the Nation waived its employment regulation authority in a separate lease for a different generating station (the Four Corners Power Plant). The Commission ruled that Aspaas controlled this case, and dismissed both complaints.
Appellants filed separate appeals to this Court. The Court consolidated the two appeals, and invited the Navajo Nation Department of Justice to file an amicus brief, which it did. The Court held oral argument on February 23, 2007 at the Window Rock District Court.
II
The issue in this case is whether the Navajo Nation Labor Commission lacks jurisdiction over employment termination complaints filed by employees at the Navajo Generating Station when the lease allowing the Station to operate bars the Nation from “directly or indirectly” regulating the “construction, maintenance or operation” at the Station.
III
The parties frame the consolidated case as concerning whether Section 16 is an “unmistakable waiver,” and whether the Ninth Circuit’s opinion in Aspaas is binding on this Court, and thereby obliges it to rule that the Nation waived the power to regulate employment. Appellants further argue before this Court that the delegation of authority to the Advisory Committee cannot include the power to approve the alleged waiver, even if clear. The Court additionally asked the parties at oral argument whether the terms “construction,” “maintenance,” and “operation” include employment regulation.
A
Before discussing the merits of this case, it is important to explain the principles governing the Nation’s jurisdiction over non-Indians because the Station is a non-Indian entity. Under the Treaty of 1868 the Nation has authority to regulate non-Indian activity on trust lands. Dale Nicholson Trust v. Chavez, 8 Nav. R. 417, 5 Am. Tribal Law 365, 371-72, 2004 WL 5658105, **6-7 (Nav.Sup.Ct.2004). This power is absolute, and does not require the Nation to fulfill the exceptions announced by the United States Supreme *562 Court in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and applied to tribal trust land in Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Id. The Nation therefore has jurisdiction, unless it has validly waived that jurisdiction in the provisions of a lease. See Office of Navajo Labor Relations ex rel. Bailon v. Central Consolidated School Dist. No. 22, 5 Am. Tribal Law 412, 414, 2004 WL 5658164, *2 (Nav.Sup.Ct.2004) (lease did not waive NPEA jurisdiction over state school board); see also Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 145-48, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).
Appellees correctly point out the Navajo principle that words are sacred and never frivolous, and therefore agreements must be fulfilled. Bailon, 5 Am. Tribal Law at 415, 2004 WL 5658164, *3. It is also true that when dealing with the sovereign powers of the Nation, only clear, unmistakable words of the Council or its properly empowered designee can waive governmental authority. To decide whether an alleged waiver is unmistakable, the Court looks to the language of the purported waiver, the agreement as a whole, and the legal context within which the agreement was entered. See Bailon, 5 Am. Tribal Law at 414-15, 2004 WL 5658164, **2-3. To be unmistakable there can be no ambiguity, and if there is any question of the intended meaning of a term there can be no waiver. The question in this case is whether, under these principles, the lease unmistakably waives employment regulation authority.
B
Operation is not defined in the lease. The Court holds that it is not “unmistakable” that “operation” includes the employment relationship between the Station and its workers. Section 16 includes three terms, “construction,” “maintenance,” and “operation.” The Station and Headwaters Resources contend “operation” includes employment, apparently based on a plain language meaning of the term. However, the meaning is not so obvious. The lease nowhere defines the term, and it is not self-evident that it includes the regulation of employment relationships at the Station. It might be that the term is restricted to the physical “operation” of the Station, that is, the mechanical or technical aspects of the generation and transmission process. It might be that “operation” means the regulation of electric rates charged to the various users of the Station’s electricity once the electricity is transmitted out of the Station. Indeed, the waiver provision includes a caveat, in that the Nation explicitly retains the authority to set retail electric rates on Navajo lands, suggesting the Nation otherwise intended to waive rate-setting authority. It might be that “operation” includes both mechanical operation and human labor at the Station, and therefore could include the regulation of human labor. However, given these multiple possibilities, without some clarification of the intended definition, the term “operation” does not “unmistakably” include employment.
This conclusion is bolstered by the fact that there is a separate provision in the lease setting employment preference. In Bailón the Court considered the meaning of an alleged waiver in a lease with a school district in the context of all of the provisions in the lease. See 5 Am. Tribal Law at 414-15, 2004 WL 5658164, **2-3. In that case, like here, there was a general waiver provision in one section of the lease, and a separate provision mandating employment preference. See id. Based on the separate provision discussing employment, the Court concluded that employment was not intended to be included *563 in the general waiver absent explicit language of inclusion. See id. That same analysis applies here. The parties to the lease separately considered and negotiated employment issues at the Station. They did not include that negotiation as a caveat to the general waiver, unlike the retail rate caveat discussed above. When considered together, it is not unmistakable that waiving the authority to regulate “operation” of the Station was meant to include employment, when the subject of employment is covered by a separate section of the lease.
Further, the legal context at the time of the lease precludes interpreting “operation” to include employment. In Bailón, the Court concluded that the general waiver could not have included employment preference under the Navajo Preference in Employment Act, as the Navajo Nation Council had passed the NPEA several months before the Chairman signed the lease. See id. at 415-16, 2004 WL 5658164, **3-4. The NPEA includes an explicit mandate requiring application of the Act upon lessee employers by operation of law, regardless of whether the lessee affirmatively agreed to abide by the Act. See 15 N.N.C. § 609(A) (2005). This provision is, in effect, a prohibition on waivers of its protections. Within that context, the Court held that the Chairman could not have waived the NPEA in an agreement signed soon after the passage of the NPEA, when the NPEA prohibited such a waiver and neither the Chairman nor the Advisory Committee were explicitly delegated the authority to waive specific statutory requirements. See 5 Am. Tribal Law at 415-16, 2004 WL 5658164, **3-4. The question is what legal context existed during the Fall of 1969 that affected whether the Council would have understood the “operation” provision to be a waiver of employment regulation. To answer this question, in addition to applying the Bailan analysis and its rulings, the Court looks to the responsibilities of leaders under Navajo Fundamental Law.
 All public officials in the Nation have a fiduciary responsibility to the Navajo people to execute the trust the People have placed with them in the administration of the government. See Thompson v. Navajo Nation, 6 Nav. R. 181, 183-84 (Nav.Sup.Ct.1990). The Council, being the People’s servant and agent, has this responsibility. See id. The Council works for and on behalf of the People in their role as naat’ánü in the Naat’ájí Na-hat’ááh (Legislative Branch). The Council legislates in the best interest of the People. See id.; In re Certified Questions II, 6 Nav. R. 105, 115, 116 (Nav.Sup.Ct.1990). Great responsibilities are placed upon the Council. Through legislation it creates offices and duties and responsibilities of officials. Id. at 12. Through legislative oversight it ensures the proper execution of these duties and responsibilities.
Just as there are fundamental rights and freedoms of individuals as acknowledged by the Council in the Navajo Bill of Rights, there are fundamental rights of the collective People, the tribal nation, as acknowledged and recognized in the Fundamental Law statute. See 1 N.N.C. §§ 202(B) (recognizing the “collective rights and freedoms of the Diyin Ni-hookáá. Dine as a distinct people”); 204 (identifying several rights of the People) (2005). It is central and foremost that the Council protects the rights of the tribe and its government. The duty to protect the government is essential, for it is through the government that the People exercise their inherent right of self-government, including conducting the business of government with other governments and regulating and approving the use or disposition of the People’s communal property the land *564 and its resources. The government in turn must protect all persons within the Nation, through, among other things, regulating the relationship between employers and employees.[1] Through employment, the people, both employees and business owners, provide for themselves and their families, and such employment assists them in living a good life. Because employment is central to living a good life, in that it provides for the well being of the people, the duty and authority to legislate or regulate for the protection of employees and employers cannot be delegated to a non-Navajo entity.[2] The trust placed with the Council to protect employment relationships through laws and regulations cannot be handed over wholesale to a non-Navajo entity; that would be a betrayal of the trust.
Under Fundamental Law, the leaders do not ever lay down this trust and the laws because a leader is taught that they must find the solution, for it is always available. Naat’áanü ídlyygo éí. t’áá nantt’a dóó t’áá nahontt’cdó, háálá lahgóó t’áá. nístl’a dahmizt’i’ ákondi Diñé Bibee-haz’ámiii dóó fume’ bina/tjf baantsáhák-eesgo éí choó’fál dóó hasih ntsáhákeesígíí beego éí t’áá bik’ee’aan hodeezt’i’ dóó ch’ídahmizt’i’, dóó inda bikáá’ háadahm-izt’T. Diyin Dine’é Ts’aa’ hadeiidiilaaígn éí t’áá. ákót’éigo yii hadad,eiidiilaalá; yah’ahóót’i’, alhééhonit’i’ dóó ch’ééhonít’i’, doo éí t’óó dádeestl’qq da. fíinahjf éí t’áá, hat’éigi sh\\ hanahat’a’ bee nistl’ajiyáago, hanahat’a’ bee hazhdinoodzíí’ dóó ajisii-hgoda. éí dóó hanahat’a’ dóó habeehaz’úa-nii doo t’óó ni’ nizhdooléelda, hatsodizin dóó hitóiie’ éí bee bikáá’ haazhdoodáát dóó bee nistl’ahazt’i’qq bee hózhqqgo bik'idiyaa nízhdooleel dóó bi’cjgzh doo gáál As explained above, and as demonstrated in the design of the sacred wedding basket, a leader through adherence to the laws, the analysis of the stories of the Diñé journey, and a positive approach will find a solution (bi’g’iídzá) around, through, or over that which confronts the people.
Under the circumstances of this case, the Council could not have legally agreed to waive employment regulation, and, per Bailón, could not have legally delegated the power to waive such regulation to the Advisory Committee. See supra, at 562-63. Therefore, the delegates could not have understood the waiver of “operation” regulation to surrender their responsibility to protect and regulate employment relationships on the Navajo Nation. Thus, there is no unmistakable waiver in the lease, as such waiver is inconsistent with Navajo principles of leadership responsibility to the people.
Based on the above analysis, the Nation retains the authority to regulate employ *565 ment at that facility, and, after the passage of the NPEA the Commission has authority to hear the complaints tiled by Appellants.
C
Even assuming arguendo that the Ninth Circuit’s opinion in Aspaos is binding on this Court, see Allstate Indemnity Co., 6 Am. Tribal Law 637, 641-42, 2005 WL 6235869, *3 (Nav.Sup.Ct.2005) (noting opinions that state courts are not bound by interpretations of federal law by circuit courts), that opinion did not consider the analysis of Navajo law as expressed above. Thus, the Aspaos opinion does not contradict this Court’s decision today. In As-paas the Ninth Circuit primarily discussed whether the federal courts had jurisdiction to review this Court’s previous opinion that the lease did not preclude regulation under the NPEA. See 77 F.3d at 1132-34. At the very end of the opinion the Circuit Court summarily concluded that the waiver in the lease, substantially similar to Section 16 in the present lease, was “unmistakable,” though it did not explain in any detail why it believed the term “operation” unmistakably included employment regulation. See id. at 1135.[3] The Nation did argue that the Council could not have waived employment regulation based on Navajo law and the “reserved-powers” doctrine applied to state governments in cases interpreting the Constitution’s Contract Clause. See Arizona Public Service Co. v. Aspaos, Response Brief for Defendants-Appellants, 1994 WL 161378954, at * 3-14, 22-29; see also supra, at 564 n. 2 (discussing “reserved-powers” doctrine). Without discussing Navajo law or the reserved-powers doctrine, the Circuit Court rejected the Nation’s argument, stating only that “[t]he legitimacy of the Navajo Tribal Council, the freely elected governing body of the Navajos, is beyond question.” Id. (quoting Kerr-McGee Corp. v. Navajo Tribe, 471 U.S. 195, 201, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985)).
As explained above, the Council’s power to waive laws and to delegate legislative authority is not absolute under Navajo law, and the Circuit Court is without authority to alter that interpretation. Like interpretations of state law by the highest court of a state, federal courts must defer to this Court’s interpretation of Navajo law. See Hinshaw v. Mahler, 42 F.3d 1178, 1180 (9th Cir.1994) (“The Tribal Court’s interpretation of tribal law is binding on this court.”) Sanders v. Robinson, 864 F.2d 630, 633 (9th Cir.1988) (same); see also Prescott v. Little Six, Inc., 387 F.3d 753, 756 (8th Cir.2004) (federal court deferred to tribal court interpretation that employment benefit plan invalid under tribal law); Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1559 (10th Cir.1997) (accepting interpretation of New Mexico Supreme Court that compact between State of New Mexico and Indian tribes was void because the Governor lacked authority to bind the state under state law). This principle is embedded in the requirement that federal courts defer to tribal courts to decide cases in the first instance. See Iowa, Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 16-17, 107 S.Ct. 971, 94 L.Ed.2d 10 *566 (1987) (“Adjudication ... by any nontribal court ... infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law.”). The federal courts may not override this Court’s interpretation that under Navajo law there is no valid waiver of the Council’s authority to regulate employment within the Nation.
IV
Based on the above, the Commission’s decisions are hereby REVERSED and VACATED. The cases are REMANDED for further proceedings on the merits of Appellants’ claims.

. This responsibility is to all people within the Nation, whether Navajo or non-Navajo. Consistent with this view, the Court interprets the NPEA to protect all employees within the Nation, including non-Indians. See Milligan v. Navajo Tribal Utility Authority, 6 Am. Tribal Law 731, 732, 2006 WL 6169000, *1 (Nav. Sup.Ct.2006) (non-Indian protected by "just cause" provision of NPEA); Staff Relief, Inc. v. Polacca, 2 Am. Tribal Law 512, 515, 2000 WL 35732587, **2-3 (Nav.Sup.Ct.2000) (equal protection clause of Navajo Bill of Rights requires non-Navajos to be protected under NPEA).

. The federal and state governments have their legal principles that a sovereign's police powers, an essential attribute of sovereignty, cannot be surrendered by contract. See, e.g., United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 24, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (discussing “reserved-powers doctrine,” and stating that Contract Clause of U.S. Constitution does not require a state to honor contract that surrenders an "essential attribute of sovereignty,”). This principle is akin to the Navajo principle expressed herein that the Council cannot delegate its responsibility to protect the people to another entity.

. The Circuit Court did discuss the establishment of a process to resolve disputes concerning employment matters at the Four Comers Power Plant, and stated that the agreement to resolve such disputes was of "particular significance” in its finding of an unmistakable waiver. See id. at 1135. That process was created through a 1985 “Letter Agreement” between the parties at the Four Comers Power Plant, and was incorporated as an amendment to the original lease. Id. at 1130-31. The lease at issue in this case, for the Navajo Generating Station, has not been amended to include an equivalent dispute resolution process.